# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

MELANEY McDANIEL,

      Plaintiff,

v.                                                 Civ. No. 16-226 GJF

NANCY A. BERRYHILL, *Acting Commissioner of the Social Security Administration*,

      Defendant.

## ORDER

THIS MATTER is before the Court on Plaintiff's "Memorandum in Support of Her Motion to Reverse and [Remand] the Commissioner's Final Decision" ("Motion"), filed on October 7, 2016. ECF No. 12. The Commissioner responded on December 9, 2016. ECF No. 17. Plaintiff replied on January 3, 2017. ECF No. 18. Having meticulously reviewed the briefing and the entire record, the Court finds that Plaintiff's Motion is well taken and that the Administrative Law Judge's ("ALJ's") ruling should be **REVERSED** and **REMANDED**. Therefore, and for the further reasons articulated below, the Court will **GRANT** Plaintiff's Motion.

## I.    BACKGROUND

Plaintiff was born on December 17, 1991, in the Stanford University Children's Hospital in Palo Alto, California. Administrative R. ("AR") 1034. In 2010, Plaintiff graduated from a California high school and received a regular diploma, although her mother reports that she received special services. AR 36, 1234. She has no past relevant work. AR 41, 289.

Plaintiff filed an application for Child Disability Benefits ("CDB") and Supplemental Security Income ("SSI") on August 15, 2011. AR 103, 117. Plaintiff claimed disability

beginning on December 17, 1991 (later amended to January 1, 2010), based on fetal alcohol and cocaine syndromes, uterine growth retardation, attention deficit hyperactivity disorder ("ADHD"), mood disorder (not specified), psychosocial stressors, scoliosis, learning disorder (not specified), headaches, and dizziness.  AR 32, 103, 117.  Plaintiff had previously filed CDB and SSI claims in 2010 which were denied.  AR 104, 118.  The Social Security Administration ("SSA") denied Plaintiff's 2011 application initially on January 6, 2012 [AR 116, 130], and upon reconsideration on October 11, 2012.  AR 146, 162.  At her request, Plaintiff received a *de novo* hearing before ALJ Michelle Lindsay on May 2, 2014, at which Plaintiff, her attorney, her mother, and a vocational expert ("VE") appeared.  AR 51-102.  On August 5, 2014, the ALJ issued her decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act ("the Act").  AR 20-44.  Plaintiff appealed to the SSA Appeals Council, but it declined review on January 19, 2016.  AR 1-3.  As a consequence, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 422.210(a) (2017).

Plaintiff timely filed her appeal with this Court on March 24, 2016.  ECF No. 1.

## II.     PLAINTIFF'S CLAIMS

Plaintiff advances two grounds for relief.  First, she argues that the ALJ erred by impermissibly "picking and choosing" only those portions of uncontradicted medical opinions that led to a finding of nondisability.  Pl.'s Mot. 7-11, ECF No. 12.  Additionally, she alleges that substantial evidence does not support the ALJ's step five determination.  *Id.* at 12-14.

## III.    APPLICABLE LAW

### A.  Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision

becomes the final decision of the agency.[1]  The Court's review of that final agency decision is both factual and legal.  *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.").

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. Substantial evidence does not, however, require a preponderance of the evidence.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court examines "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases."  *Lax*, 489 F.3d at 1084.  The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so."  *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

---

[1] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review.  20 C.F.R. § 404.981 (2017); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

**B. Sequential Evaluation Process**

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2017). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App. 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e). In phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the functional requirements of his past relevant work to determine if the claimant is still capable of performing his past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

If the claimant cannot return to his past work, then the Commissioner bears the burden at the fifth step of showing that the claimant is nonetheless capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also*

*Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV.    THE ALJ'S DECISION

The ALJ issued her decision on August 15, 2014.  AR 44.  At step one, she found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 1, 2010.  AR 32.  At step two, the ALJ found Plaintiff's Type I diabetes mellitus and scoliosis to be severe impairments.  AR 22.  In contrast, the ALJ found Plaintiff's mood disorder to be non-severe.  AR 22.

At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 23-24.  The ALJ began with Plaintiff's mood disorder, which she considered under "the four broad functional areas set out in the disability regulations for evaluating mental disorders" and in Listing 12.00(C).[2]  In the first functional area, activities of daily living ("ADLs"), the ALJ found Plaintiff had no limitation.  She based this finding on Plaintiff's wide variety of ADLs, which included preparing meals on a daily basis, vacuuming, doing laundry, washing dishes, driving a car, shopping for groceries, walking the dog, feeding horses, and bathing and dressing herself.  AR 23.  In the second area, social functioning, the ALJ found that Plaintiff had "mild limitation."  AR 23.  The ALJ reached this conclusion based on Plaintiff's admission that she "spent time with others on the telephone or on the computer," but weighed it alongside Plaintiff's competing admission that she "had problems getting along with

---

[2] Listing 12.00(C) does not refer to a specific mental impairment, but rather, to the types of evidence that the SSA considers in evaluating all mental disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 12.00(C) (2017).  This includes evidence from, *inter alia*: (1) acceptable medical sources; (2) those who know the claimant, especially regarding a claimant's activities of daily living; (3) school and work; (4) sources demonstrating longitudinal evidence of a mental disorder; and (5) sources substantiating a claimant's faculty for functioning in unfamiliar and in supportive situations.  *Id.*

family, friends[,] and neighbors" and that "she "was unstable and concerned about what others were doing." AR 23. Additionally, the ALJ considered Plaintiff's mother's statement that it was difficult for Plaintiff to make friends. AR 23. Third, as to Plaintiff's concentration, persistence, and pace, the ALJ also found Plaintiff to have a mild limitation. She based this on Plaintiff's reports that "she could follow written instructions better than verbal instructions" and "had a hard time following and remembering verbal instructions." AR 23. Lastly, regarding episodes of decompensation, the ALJ found "little in the record or [Plaintiff's] testimony that would indicate the claimant has suffered from any episodes of decompensation." AR 23. Thus, because Plaintiff's "medically determinable mental impairment causes no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration," the ALJ found that Plaintiff's mental impairment was both non-severe and insufficient to qualify as presumptively disabling under a relevant Listing. AR 23-24.

Next, the ALJ considered Plaintiff's physical impairments under relevant Listings. She began by evaluating Plaintiff's lower back pain under Listing 1.04[3] for disorders of the spine.

---

[3] To qualify as disabled under Listing 1.04, a claimant must suffer from one or more of the following:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.* § 1.04.

The ALJ found that "[t]he medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis" required to satisfy the Listing. AR 24. "Moreover," she opined, "the medical evidence does not support [a finding that Plaintiff's] back disorder has resulted in an inability to ambulate effectively, as defined in [Listing] 1.00(B)(2)(b)." AR 24. Accordingly, the ALJ found Plaintiff did not meet or medically equal the requirements of Listing 1.04.

The ALJ then considered Plaintiff's Type I diabetes under Listing 9.00 for endocrine disorders. Looking specifically to Listing 9.00(B)(5),[4] the ALJ found that "the medical evidence failed to support the necessary requirements or severity level for that listing." AR 24. "Therefore," she concluded, Plaintiff's "diabetes does not meet the listing." AR 24.

Because none of Plaintiff's impairments satisfied an applicable Listing, the ALJ moved on to step four and assessed Plaintiff's RFC. AR 24-43. "After careful consideration of the entire record," the ALJ determined that "[Plaintiff] has the residual functional capacity to

---

[4] The SSA defines endocrine disorders as medical conditions that cause a hormonal imbalance. It further describes and evaluates diabetes as follows:

> Diabetes mellitus and other pancreatic gland disorders disrupt the production of several hormones, including insulin, that regulate metabolism and digestion. Insulin is essential to the absorption of glucose from the bloodstream into body cells for conversion into cellular energy. The most common pancreatic gland disorder is diabetes mellitus (DM). There are two major types of DM: type 1 and type 2. Both type 1 and type 2 DM are chronic disorders that can have serious disabling complications that meet the duration requirement. Type 1 DM—previously known as "juvenile diabetes" or "insulin-dependent diabetes mellitus" (IDDM)—is an absolute deficiency of insulin production that commonly begins in childhood and continues throughout adulthood. Treatment of type 1 DM always requires lifelong daily insulin. With type 2 DM—previously known as "adult-onset diabetes mellitus" or "non-insulin-dependent diabetes mellitus" (NIDDM)—the body's cells resist the effects of insulin, impairing glucose absorption and metabolism. Treatment of type 2 DM generally requires lifestyle changes, such as increased exercise and dietary modification, and sometimes insulin in addition to other medications. While both type 1 and type 2 DM are usually controlled, some persons do not achieve good control for a variety of reasons including, but not limited to, hypoglycemia unawareness, other disorders that can affect blood glucose levels, inability to manage DM due to a mental disorder, or inadequate treatment.

*Id.* § 9.00(B)(5).

perform the full range of light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)."
AR 24.

### *Adverse Credibility Finding*

To develop Plaintiff's RFC, the ALJ relied on two principal grounds. First, the ALJ rendered an adverse credibility finding against Plaintiff, opining that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not entirely credible." AR 26. Several bases informed the ALJ's findings, and chief among them were Plaintiff's own statements. The ALJ recounted that, on an undated disability report [AR 309-16], Plaintiff claimed that she suffered from "fetal alcohol, fetal cocaine, uterine growth retardation, attention deficit/hyperactivity disorder (ADHD), mood disorder, psychosocial stressors, scoliosis, learning disorder, headaches and dizziness which limits her ability to work." AR 25. Plaintiff alleged that these conditions affected, among other things,[5] "her memory, completing tasks, her concentration, following instructions, [ ] getting along with others," and moreover, that "her diabetes affected her memory, concentration[,] and completing tasks." AR 25. "Despite these allegations," the ALJ remarked, Plaintiff "also stated on the same function report that she could prepare her own meals on a daily basis, fold clothes, put dishes away[,] and pull weeds." AR 25. In the same report, Plaintiff also "stated she could go shopping in stores for groceries and clothes and she could drive a car." AR 25. In a separate function report dated August 26, 2012 [AR 345-52], Plaintiff additionally noted "she had no problems with her personal care, such as getting dressed or taking a bath . . . [and] that her hobbies and interests included horses, goats, music, IPOD and being on the computer," and further, "that she did those hobbies on a daily basis and she did them fairly well." AR 25. The ALJ also suggested Plaintiff

---

[5] Because Plaintiff's instant appeal centers on the ALJ's assessment of her mental, non-exertional impairments, *see* Pl.'s Mot. 7-14, ECF No. 12, this Order will be similarly focused, despite the ALJ discussing, in detail, Plaintiff's physical limitations.

"has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as [Plaintiff] has alleged in connection with this application, which weakens her credibility." AR 25.

Other inconsistencies in Plaintiff's statements factored into the ALJ's credibility finding. Among these, the ALJ recalled Plaintiff's testimony that she stopped riding horses in November 2013, and measured that testimony against "an initial assessment comp[le]ted on June 3, 2014, [where Plaintiff] stated that her current exercise habits included occasional walks or riding horses." AR 26 (citing AR 1220). Plaintiff's testimony also conflicted with that of her mother, who "testified that her daughter still rode horses, but [not] as much as she used to." AR 26. In a similar instance, Plaintiff testified "that she barely used the computer to check her email and that was about it." AR 26. The ALJ observed, however, that "it was noted in the medical evidence that [Plaintiff] had done [computer] research because she thought she had Asperger's syndrome instead of attention deficit disorder or obsessive-compulsive disorder." AR 226 (citing AR 1219). The same document recorded that Plaintiff had "printed off some information on Asperger's from the Internet and she presented with a list of symptoms she had checked off." AR 26. Although the ALJ cautioned that these inconsistent statements "may not be the result of a conscious intention to mislead," nevertheless, she opined, "the inconsistencies suggest the information provided by the claimant generally may not be entirely reliable." AR 26.

The ALJ also reasoned that Plaintiff's credibility was diminished by the declarations of her mother, Mary McDaniel. Ms. McDaniel completed a Third Party Function Report on August 26, 2012 [AR 337-41], and therein ratified many of her daughter's statements, including the fact that Plaintiff "did not have any problems with her personal care, such as getting dressed or taking a bath." AR 25. Ms. McDaniel also observed that Plaintiff "could prepare her own meals on a

daily basis, do laundry, some weeding . . . vacuum[ ] her room . . . drive a car, and go shopping in stores for items." AR 25. She also recognized that Plaintiff could "go horseback riding and that she attended church activities." AR 25.

Lastly, the ALJ looked to other portions of the record to substantiate an adverse credibility finding. In one example, the ALJ looked to Plaintiff's wage records, which demonstrated that Plaintiff had earned $1,492.02 in 2011, $2,034.02 in 2012, and $6,065.48 in 2013. AR 25 (citing AR 254-56). In the ALJ's opinion, "[t]he fact that the impairments did not prevent the claimant from working at that time strongly suggests that it would not currently prevent her from working now, which weakens her credibility." AR 25. In another instance, the ALJ highlighted a disability report evincing that Plaintiff left her place of employment in 2011 not on account of her impairments, but because of a residential move. AR 26 (citing AR 298). The ALJ opined that "this shows the [Plaintiff] stopped working for reasons not related to the allegedly disabling impairments." AR 26. For these and the other reasons detailed above, the ALJ returned an adverse credibility determination against Plaintiff.

### *Medical Opinions*

#### *Dr. R. Paxton, M.D. – significant weight*

Along with Plaintiff's adverse credibility finding, the ALJ relied on a host of medical opinions to determine Plaintiff's RFC. In fact, the ALJ ultimately drew on no less than *five* medical opinions just to assess Plaintiff's mental impairments. The first of these was the opinion of Dr. R. Paxton, M.D., a psychiatrist and specialist in disability determination. On December 10, 2010, Dr. Paxton completed a standard SSA "Psychiatric Review Technique" ("PRT") form as well as a Mental Residual Function Capacity Assessment ("MRFCA"). AR 863-876. After reviewing Plaintiff's medical history in light of her anxiety-related disorders [AR 863], Dr.

Paxton concluded on the MRFCA that Plaintiff had no significant limitation in the four categories and twenty subcategories measured by the MRFCA,[6] with three exceptions.  These three exceptions – each of which was identified as a moderate limitation – included:

[6] The SSA has developed four categories and twenty subcategories in which non-examining consultative medical professionals evaluate claimants and assign summary conclusions.  It should be noted, however, that these summary conclusions serve only as an aid to the evaluating medical professional's assessment of residual functional capacity.  When reviewing an ALJ's decision on appeal, the Tenth Circuit has guided reviewing courts to compare an ALJ's findings to a medical professional's narrative on residual functional capacity, not to her summary conclusions of moderate limitations.  *See Smith v. Colvin*, 821 F.3d 1264, 1269 n.2 (10th Cir. 2016)

In each of these four categories, the medical professional may rate the claimant as: (1) showing no evidence of limitation in the category; (2) not significantly (or mildly) limited; (3) moderately limited; or (4) markedly limited.  There is also a fifth option for the professional to select if the claimant is not ratable in a given category based on the available evidence.  The categories are as follows:

(A) Understanding and memory
    (1) The ability to remember locations and work-like procedures
    (2) The ability to understand and remember very short and simple instructions
    (3) The ability to understand and remember detailed instructions

(B) Sustained concentration and pace
    (4) The ability to carry out very short and simple instructions
    (5) The ability to carry out detailed instructions
    (6) The ability to maintain attention and concentration for extended periods
    (7) The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances
    (8) The ability to sustain an ordinary routine without special supervision
    (9) The ability to work in conjunction with or proximity to others without being distracted by them
    (10) The ability to make simple work-related decisions
    (11) The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

(C) Social interaction
    (12) The ability to interact appropriately with the general public
    (13) The ability to ask simple questions or request assistance
    (14) The ability to accept instructions and respond appropriately to criticism from supervisors
    (15) The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes
    (16) The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

(D) Adaptation
    (17) The ability to respond appropriately to changes in the work setting
    (18) The ability to be aware of normal hazards and take appropriate precautions
    (19) The ability to travel in unfamiliar places or use public transportation
    (20) The ability to set realistic goals or make plans independently of others.

> (1) Subcategory (A)(3) - Understanding and memory: the ability to understand and remember detailed instructions;
> (2) Subcategory (B)(5) - Sustained concentration and persistence: the ability to carry out detailed instructions; and
> (3) Subcategory (C)(12) - Social interaction: the ability to interact appropriately with the general public.

AR 874-75. Dr. Paxton determined that Plaintiff "has the capacity to do simple level work at two hour intervals in a non[-]public setting. Concentrative capacity is sufficient. Adaptive capacity is also sufficient." AR 876. The ALJ assigned *significant weight* to Dr. Paxton's opinion, concluding that his findings were "persuasive . . . as they are well supported by explanation and by the medical evidence, and they reflect consideration of the entire medical record[ ] by a specialist who is familiar with [SSA] regulations." AR 36.

*Dr. Robert Krueger, Ph.D. – moderate weight*

Consultative examining psychologist Dr. Robert Krueger, Ph.D., examined Plaintiff on December 1, 2011. AR 1011-17. Later, on April 16, 2014, he completed a questionnaire concerning Plaintiff's mental impairments for the instant disability review. AR 1142-44.

At the 2011 consultation, Dr. Krueger administered the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV") test and determined that Plaintiff had a full scale IQ of 108. AR 37. Plaintiff "scored at an average to high average level with both verbal and performance skills[,] . . . did well with vocabulary and work comprehension skills[,] and she also did well with abstract reasoning." AR 37. Although the doctor noted that Plaintiff "did not appear to qualify for having any major cognitive disorder at that time," he did "diagnose[ ] the claimant with a mood disorder – not otherwise specified." AR 37.

Along with the diagnosis of mood disorder, Dr. Krueger "determined that [Plaintiff] had some significant functional impairment." AR 37. This derived primarily from Plaintiff's Global

---

*See* AR 112-14, 126-28, 142-45, 159-61, 874-75.

Assessment of Functioning ("GAF") score, which Dr. Krueger assessed to be in the range of 50 to 55. A GAF score in that range "indicates serious to moderate symptoms or any serious impairment to moderate [impairment] on social, occupational[,] or school functioning." AR 37 (citation omitted). Thus, while Dr. Krueger found that Plaintiff "did have the intellectual capacity to understand and remember either simple or complex work instruction with little or no impairment," he noted that Plaintiff "appeared to be somewhat socially immature," and, at the time of the evaluation, "might not possess independent living skills." AR 37-38. Dr. Krueger further found Plaintiff to have moderate impairments with: (1) maintaining pace and persistence in a work environment, (2) in relationships with coworkers, supervisors, and the general public, (3) traveling to distant places alone, and (4) being aware of and reacting appropriately to dangers in work environments. AR 1016. Notably, Dr. Krueger also concluded that "[b]ecause of behavior problems and mood disorder, [Plaintiff] may have moderate and *at times marked* impairment with following instructions." AR 1016 (emphasis added).

When he completed a questionnaire on Plaintiff's mental impairments in 2014, Dr. Krueger opined Plaintiff "had limitations in her ability to perform work on a full time basis and that her psychologically based symptoms would cause problems for her maintaining regular attendance and being punctual within customary tolerances." AR 38. He further concluded that Plaintiff would miss work or arrive late an average of five days per month. AR 38. The ALJ assigned only *moderate weight* to the opinion of Dr. Krueger, reasoning that he "only saw [Plaintiff] once, and he based his answers on the questionnaire on that [one] meeting." AR 38.

### Dr. Elizabeth Chiang, M.D. – moderate weight

The ALJ also accorded *moderate weight* to the opinion of non-examining state medical consultant Dr. Elizabeth Chiang, M.D. AR 38. On January 4, 2012, at the initial determination

stage of the instant disability claim, Dr. Chiang reviewed Plaintiff's medical records and assessed her MRFCA in the four broad categories developed by the SSA along with their twenty subcategories.[7]  AR 112-14, 126-28.  In many of these, Dr. Chiang either found Plaintiff to suffer no limitations, or that no evidence existed to support a limitation.  AR 112-13, 126-27. She did, however, assess the following four moderate limitations:

> (1) Subcategory (C)(12) -  Social interaction: the ability to interact appropriately with the general public;
> (2) Subcategory (C)(14) - Social interaction: the ability to accept instructions and respond appropriately to criticism from supervisors;
> (3) Subcategory (C)(15) - Social interaction: the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and
> (4) Subcategory (D)(20) - Adaptation: the ability to set realistic goals or make plans independently of others.

AR 112-13, 126-27.

The ALJ emphasized that Dr. Chiang found no limitation in Plaintiff's ability to: (1) carry out very short and simple instructions, (2) carry out detailed instructions; (3) perform activities within a schedule, (4) maintain regular attendance, and (5) be punctual within customary tolerances.  AR 38.  Nevertheless, the ALJ recognized that Dr. Chiang found areas of both mild and moderate limitation in Plaintiff's mental functions. As to the former, the ALJ discussed Dr. Chiang's conclusion that Plaintiff "was mildly limited in her activities of daily living and in maintaining her concentration, persistence [and] pace."[8]  AR 38.  She also mentioned Dr. Chiang's conclusion that Plaintiff "was moderately limited in her social

---

[7] Dr. Chiang actually found no limitation in the category of understanding and memory, and therefore, did not assess any subcategory individually.  AR 112, 126.

[8] This conclusion derives from Dr. Chiang's PRT assessment for presumptive disability at step three of the sequential evaluation process.  *See* AR 108, 122.

functioning,"[9] as well as in "her ability to respond appropriately to changes in the work setting." AR 38.

Dr. Chiang found Plaintiff, on balance, to be "capable of semi-skilled work" at the "light exertional level." AR 38. The ALJ noted this, but did observe that Dr. Chiang recommended "a workplace with well-defined expectations and limited interpersonal interaction." AR 38. The ALJ assigned *moderate weight* to Dr. Chiang's opinion, as she found it to be "persuasive" and "well supported by explanation and the medical evidence." AR 38. Moreover, the ALJ explained that the opinion "reflect[ed] consideration of the entire medical record[ ] by a specialist who is familiar with Social Security regulations." AR 38.

*Dr. Mary Loescher, Ph.D. – moderate weight*

On January 6, 2012, the SSA denied Plaintiff's initial-stage request for CDB and SSI benefits. AR 116, 130. Plaintiff requested reconsideration on March 9, 2012, indicating that her impairments continued to prevent her from engaging in substantial gainful activity. AR 174. Based on that request, the SSA ordered a second examination of Plaintiff's mental functions, and on September 25, 2012, which was performed by consultative examining psychologist Dr. Mary Loescher, Ph.D. AR 1128-31.

Following a review of Plaintiff's medical records, an interview of Plaintiff's mother, and an examination of Plaintiff herself, Dr. Loescher diagnosed Plaintiff with adjustment disorder and mood disorder on rule-out bases. AR 1131. Dr. Loescher opined that Plaintiff was mildly impaired in three areas: (1) handling basic instructions, (2) working in a structured setting, and (3) understanding, remembering, and following through on basic and complex instructions. AR 1131. Additionally, she believed Plaintiff was moderately impaired in her "ability to function in a work setting on a consistent basis due to her difficulties interacting with peers and the

---

[9] This citation is also taken from Dr. Chiang's step three assessment. *See* AR 108, 122. *See also supra*, note 7.

possibility that she would not be able to recognize dangers in a work setting." AR 1131. She explained that Plaintiff "appears to have some depression and possibly some anxiety secondary to the loss of her sister and the changes in her life due to the relocation from California." AR 1131. Yet, she noted that Plaintiff had previously demonstrated "average to high average cognitive abilities" and that her "working memory scores are in the high average range." AR 1131. The ALJ assigned *moderate weight* to Dr. Loescher's opinion, finding it "persuasive" and "well supported by the medical evidence." AR 40.

   *Dr. Cathy Simutis, Ph.D. – significant weight*

   Lastly, the ALJ assigned *significant weight* to the opinion of Dr. Cathy Simutis, Ph.D., a non-examining state psychologist. AR 40-41. Dr. Simutis reviewed Plaintiff's records at the reconsideration stage, and therefore drew on the greatest body of medical records when crafting Plaintiff's PRT and MRFCA. AR 140-45, 156-161. She, like Dr. Chiang at the initial stage, evaluated Plaintiff in the four categories developed by the SSA along with their twenty subparts. *See supra*, pp. 13-14; *see also supra*, note 6. In most subcategories, Dr. Simutis found Plaintiff to suffer from no significant limitation. In fact, Dr. Simutis found Plaintiff to possess moderate limitations in only three areas:

   (1) Subcategory (B)(5) - Sustained concentration and persistence: the ability to carry out detailed instructions;
   (2) Subcategory (B)(6) – Sustained concentration and persistence: the ability to maintain attention and concentration for extended periods; and
   (3) Subcategory (C)(12) - Social interaction: the ability to interact appropriately with the general public.

AR 142-44, 158-60.

   The ALJ, however, made no mention of the moderate limitations assigned by Dr. Simutis. AR 40-41. Instead, the ALJ focused on those areas where Dr. Simutis had found Plaintiff to not be significantly limited, including her ability to: (1) carry out very short and

simple instructions, (2) perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (4) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. AR 40. Furthermore, the ALJ focused on Dr. Simutis's finding that Plaintiff was only "partially credible[,] as her function report indicated that she shopped, drove[,] and went to a church group – weekly, she was in school taking math and English classes at CNM." AR 41. Additionally, the ALJ cited with approval Dr. Simutis's conclusion that Plaintiff generally retained the "capacity for semi-skilled work." AR 41. The ALJ found the opinion of Dr. Simutis "persuasive" and accorded it "significant weight" as it was "well supported by explanation and by the medical evidence, and [it] reflect[ed] consideration of the entire medical record[ ] by a specialist who is familiar with Social Security regulations." AR 41.

The ALJ concluded, based on Plaintiff's adverse credibility finding and these five medical opinions, that Plaintiff's "residual functional capacity assessment is supported by the objective medical evidence contained in the record." AR 43. She reasoned that "[t]reatment notes in the record do not sustain the [Plaintiff's] allegations of disabling conditions." AR 43. In addition, she found that Plaintiff "does experience some levels of physical limitations but only to the extent described in the residual functional capacity listed above." AR 43.

In the second phase of step four, the ALJ found that Plaintiff had no past relevant work. AR 43. As a consequence, she omitted the comparison between Plaintiff's assigned RFC and past relevant work that would ordinarily occur in the third phase of step four. AR 43. Instead, the ALJ proceeded to step five. There, the ALJ explained that because Plaintiff "has solely nonexertional limitations, section 204.00 in the Medical Vocational Guidelines [commonly

referred to as 'the grids'] provides a framework for analysis." AR 43. And, "[b]ased on a residual functional capacity for the full range of light work, considering [Plaintiff's] age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.20." AR 43. Finally, the ALJ found that Plaintiff had not been under a disability, as defined by the Act, during the relevant time period and denied her claim. AR 44.

## V. ANALYSIS

Plaintiff's Motion advances two allegations of error, but neither distills the terminal infirmity of the ALJ's decision. Indeed, it is neither a "pick and choose" violation nor a step five error – as Plaintiff alleges - that dooms the ALJ's decision. Rather, the decision fails appellate scrutiny because the ALJ did not provide intelligible analysis of the medical opinions that informed the nonexertional portion of Plaintiff's RFC. And because this analytical deficiency precludes meaningful review by this Court, the undersigned cannot find that substantial evidence supports Plaintiff's RFC. The Court's rationale follows below.

### A. Plaintiff's RFC Is Not Supported by Substantial Evidence

Plaintiff begins by asserting that while an ALJ "is entitled to resolve any conflicts in the record, she cannot pick and choose[10] through uncontradicted medical opinions, taking only those parts that are favorable to a finding of nondisability." Pl.'s Mot 7. She then explains that, in defiance of this rule, "[t]he ALJ – contrary to all doctors who examined or reviewed [Plaintiff's] claim – found no limitations, finding [Plaintiff] capable of physically performing the full range of light work." *Id.* at 8.

---

[10] *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."). The "pick and choose" rule, as it has become known, derives from this seminal case.

To support her claim, Plaintiff documents the nonexertional limitations recommended by each of the three non-examining consultants: Dr. Chiang, Dr. Simutis, and Dr. Paxton. *Id.* at 8-9. Additionally, Plaintiff details the various nonexertional limitations identified by Dr. Krueger and Dr. Loescher, the two consultative examiners. *Id.* at 9-10. Plaintiff takes exception to the ALJ assigning either "significant" or "moderate" weight to each of these five medical professionals, alleging that by doing so – and by not overtly discounting any of the five opinions – the ALJ "created multiple unresolved conflicts." *Id.* at 10. Based on her reading of *Haga v. Astrue*, Plaintiff concludes that "when the ALJ explicitly finds the evidence supported in the record, but implies no explanation for rejecting any of the limitations opined by these doctors and never states in the decision she actually rejected the opinions, there is simply no plausible basis to affirm the decision." *Id.* at 11 (citing *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007); *Dutton v. Colvin*, 635 F. App'x 504 (10th Cir. 2015) (unpublished)).

The Commissioner responds by reframing the issue thus: "[w]here the record did not reflect that [Plaintiff] had any major social limitations that would preclude the minimal social demands of unskilled work, did the ALJ reasonably find her not disabled under the grids?" Def.'s Resp. 2. She explains that "the ALJ ultimately applied the grids . . . and all of the occupations contemplated by the grids are *unskilled*." *Id.* at 6. Furthermore, the Commissioner relates that "[u]nskilled jobs generally involve working with objects instead of with people, and require little by way of social functioning." *Id.* at 7. She then provides the following overview for the remainder of her response:

> [Plaintiff's] sparse mental health treatment during the relevant period, her past work in customer service, and her involvement in a theater company and church activities do not support additional social limitations that would erode the unskilled job base anticipated by the grids, and so even if the Court finds the ALJ should have included social limitations in the RFC finding, any omission on the ALJ's part was harmless because it did not affect the outcome of the case.

*Id.*

The Commissioner counters Plaintiff's Motion with three arguments. The first focuses on the grids, which the Commissioner notes "only take notice of unskilled jobs." *Id.* (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *3 (Jan 1, 1983)). She directs this Court to the governing regulations, which provide that "[u]nskilled jobs require little or no judgment to do simple duties that can be learned on the job in a short period of time." *Id.* (citing 20 C.F.R. § 404.1568(a) (2017)). The Commissioner also points this Court to multiple SSA Rulings for the proposition that unskilled work involves only "basic mental demands." *Id.* The first of these details that unskilled work involves "respond[ing] appropriately to supervision, coworkers, and usual work situations," and deals primarily "with objects, rather than with data or people." *Id.* (quoting SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985)). The next clarifies that "there are nonexertional limitations or restrictions which have very little or no effect on the unskilled light occupational base." *Id.* (quoting SSR 83-14, 1983 WL 31254, at *5 (Jan. 1, 1983)).

The second prong of the Commissioner's response draws from the "record as a whole" to substantiate Plaintiff's lack of social limitations "that would significantly erode the unskilled job base contemplated by the grids." *Id.* After reviewing exemplars of the social limitations assigned by the five relevant medical professionals, the Commissioner opines that "while the opinion evidence may have suggested some impairment in social functioning, those limitations would not necessarily preclude the unskilled jobs anticipated by the grids." *Id.* at 8. She bolsters her position by recalling the ALJ's observation that Plaintiff worked at least two different jobs during the relevant time period. *Id.* Likewise, the Commissioner recalls Plaintiff's numerous ADLs, including attending a church group, working at a local theater group, and attending

college. *Id.* at 9. "Finally," the Commissioner reasons, "the medical evidence of record shows little mental health treatment during the relevant period, and [that] medication helped control her symptoms." *Id.*

The Commissioner builds upon the preceding prongs to construct the third and final segment of her response. Here, she suggests that Plaintiff's "mental health record does not suggest any social limitations precluding unskilled work . . . [which] in turn, leaves the light, unskilled base contemplated by the grids intact." *Id.* at 10. Accordingly, she concludes, "[a]ny arguable mistake on the ALJ's part in formulating the RFC finding is thus harmless." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

### 1.     Standard for evaluating medical evidence

An ALJ must evaluate every medical opinion in the record, although the weight given to each opinion will vary according to the relationship between the disability claimant and the medical professional. *Hamlin,* 365 F.3d at 1215. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("[t]he opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."); 20 C.F.R. § 404.1527(c) (2017). On issues including the RFC determination and the ultimate issue of disability, opinions from any medical source must be carefully considered and "*must never be ignored.*" SSR 96–5p, 1996 WL 374183 at *2–3 (July 2, 1996) (emphasis added). *See Victory v. Barnhart,* 121 F. App'x 819, 825 (10th Cir. 2005) (unpublished) (finding it is clear legal error to ignore a medical opinion). Regulations provide several specific factors for evaluating a medical opinion. *See* 20 C.F.R. § 404.1527(d)(1)-(6). Using these factors, ALJs are directed to weigh medical source

opinions and to provide "appropriate explanations for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183, at *5.

When assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why. *Id.* Nevertheless, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on [a specific] functional capacity . . . because the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (alteration and internal quotation marks omitted)). Nevertheless, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Id.* at 1292 (internal brackets omitted) (quoting *Haga*, 482 F.3d at 1208). It is reversible error for the ALJ not to discuss uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects. *Grogan v. Barnhart,* 399 F.3d 1257, 1266 (10th Cir. 2005).

### 2.    Articulation standard

On appellate review, an ALJ's findings must be sufficiently specific to allow for meaningful review. *See Langley*, 373 F.3d at 1123. If an ALJ's decision is not articulated with sufficient particularity to allow for judicial review, the court cannot affirm the decision as legally correct. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). As a baseline, the ALJ must support his or her findings with specific weighing of the evidence and "the record must demonstrate that the ALJ considered all of the evidence." *Id.* at 1009-10.

According to SSR 96–8p,[11] the RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g.,

---

[11] SSR rulings are binding on an ALJ. *See Sullivan v. Zebley,* 493 U.S. 521, 530 n. 9 (1990); *Nielson v. Sullivan,* 992 F.2d 1118, 1120 (10th Cir. 1993); 20 C.F.R. § 402.35(b)(1) (2017).

laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184 at *7 (July 2, 1996). The ALJ must also explain "how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. *Id.* When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that his RFC conclusions are not supported by substantial evidence. *See Southard v. Barnhart,* 72 F. App'x. 781, 785 (10th Cir. 2003) (unpublished) ("Because the ALJ failed to make all the detailed findings required by the regulations and rulings at step four, his RFC conclusions are not supported by substantial evidence.").

### 3. The Court cannot meaningfully review the ALJ's RFC determination

An ALJ's decision must be sufficiently specific and articulated to allow for meaningful judicial review. *See Clifton,* 79 F.3d at 1009. These requirements, which are noticeably qualitative rather than quantitative, are the attributes of a well-crafted administrative decision, irrespective of whether its findings are ultimately upheld. Unfortunately, they also describe the obverse of the decision currently under review.

ALJ Lindsay clearly reviewed the evidence of record. In fact, she recorded an encyclopedic summary of the evidence, surpassing any this Court has seen. *See* AR 22-43. Yet, while the decision benefitted from this attention to detail, it faltered in its *analysis* of those details, and it is that absence that necessitates remand.

The ALJ's RFC determination fails for numerous reasons. The first is the decision's confusing nomenclature. In weighing the medical opinions related to Plaintiff's exertional

limitations, the ALJ communicated her evaluations through the common, easily understood terms of "significant weight" and "little weight." AR 41-42. She did not do so, however, with the five medical opinions concerning Plaintiff's nonexertional impairments. Instead, the ALJ assigned "significant weight" to the opinions of Dr. Paxton and Dr. Simutis, while assigning a more amorphous "moderate weight" standard to the opinions of Dr. Krueger, Dr. Chiang, and Dr. Loescher. AR 36-41. Notably, by assigning these two types of weight, the ALJ did not overtly reject any of the five medical opinions – *none* of which entirely agree.

Next, the ALJ compounded her error by evaluating each medical opinion with either summary or boilerplate language. The ALJ assigned moderate weight to the opinion of Dr. Krueger for no other reason than he "saw the claimant once, and he based his answers on that questionnaire on that 1 meeting."[12] AR 38. She assigned the same weight to Dr. Loescher's opinion, but proffered the following perfunctory explanation to justify her evaluation: "I find Dr. Loescher's opinion persuasive and accord[ ] it moderate weight, as it is well supported by explanation and by the medical evidence." AR 40. The greater part of this cursory explanation then reappeared in the evaluations of the opinions of Dr. Paxton, Dr. Chiang, and Dr. Simutis, each of which were evaluated by the *exact same*, one-sentence narrative: "they are well supported by explanation and by the medical evidence and they reflect consideration of the entire medical records by a specialist who is familiar with Social Security regulations." AR 36 (Dr. Paxton), AR 38 (Dr. Chiang), AR 41 (Dr. Simutis).[13] But, paradoxically, the ALJ used this same unhelpful, stock language to assign *significant weight* to Dr. Paxton and Dr. Simutis on the one

---

[12] The ALJ did not explain precisely why she discounted Dr. Krueger's opinion. When the SSA or affiliated state agencies send a claimant on a consultative examination, it is just that – a one-time consultation. Under the ALJ's logic, any consultative examination is therefore inherently devalued.

[13] The ALJ also justified assigning significant weight to Dr. Mark Werner, M.D. and Dr. Allen Gelinas, M.D., who opined on Plaintiff's exertional limitations, using the same boilerplate language. AR 41 (Dr. Werner), AR 42 (Dr. Gelinas).

hand, and *moderate weight* (a presumably lower weight than significant) to Dr. Chiang on the other. This leaves the Court in the unenviable position of trying to divine whether the ALJ erroneously assigned moderate weight to Dr. Chang, or incorrectly assigned significant weight to one or both of the opinions of Dr. Paxton or Dr. Simutis. Alternatively, the boilerplate language may be exactly what it appears to be: the veneer of analysis, applied at once robotically and haphazardly. In either case, the ALJ's nebulous terminology combined with rote, inconsistent summary narratives confuses the decision sufficiently so as to preclude this Court from engaging in a meaningful review. *See Clifton*, 79 F.3d at 1009.

Plaintiff adds that "[i]n assigning either moderate or significant weight to all of the doctors' opinions, the ALJ created unresolved conflicts in the evidence." Pl.'s Mot. 10. For this Court, the principal infirmity of the ALJ's terminology and its application does not derive from an unresolved conflict. Regulations charge the ALJ with resolving conflicts, and in this case, the ALJ did so (albeit without the required substantial evidence) by applying the grids, thereby limiting Plaintiff to unskilled work. *See Haga*, 482 F.3d at 1208 ("the ALJ is entitled to resolve any conflicts in the record"). However, regulations also direct ALJs to use the factors detailed in 20 C.F.R. § 404.1527(d)(1)-(6) to weigh medical source opinions and to provide "appropriate explanations for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183, at *5. This, the ALJ did not do.

Rather than providing appropriate explanations for her evaluations of medical opinions, the ALJ used vague, summary, and confusing language. The ALJ's one-sentence narratives, often boilerplate and inconsistently applied, are insufficiently specific to allow the undersigned to meaningfully review her decision. *See Langley*, 373 F.3d at 1123. As a consequence, this Court must conclude that her RFC conclusions are not supported by substantial evidence. *See*

*Southard*, 72 F. App'x. at 785 ("Because the ALJ failed to make all the detailed findings required by the regulations and rulings at step four, his RFC conclusions are not supported by substantial evidence.").

### 4. Even if properly articulated, the ALJ's RFC conclusion would violate the "pick and choose" rule

The preceding explains why the ALJ's decision must be reversed and remanded. It also details the deficiencies of the opinion so that these errors may be avoided and/or cured on remand. To further illuminate the administrative proceedings to follow, the Court will now explain why, even if the ALJ had properly articulated her reasoning, her opinion would have nonetheless violated the "pick and choose" rule announced in *Haga v. Astrue*.

In 2007, the Tenth Circuit published two cases that control here. First, in *Haga*, the court held that an ALJ erred in failing to explain why he adopted some of a consultative examiner's restrictions but rejected others. *See Haga*, 482 F.3d at 1208. "[T]he ALJ did not state that any evidence conflicted with [the consultative examiner's] opinion or mental RFC assessment. So it is simply unexplained why the ALJ adopted some of [the consultative examiner's] restrictions but not others." *Id.* The court, therefore, remanded "so that the ALJ [could] explain the evidentiary support for his RFC determination." *Id.* Later in 2007, the Tenth Circuit expressly applied *Haga* and its reasoning to the opinions of nonexamining physicians in *Frantz v. Astrue*, 509 F.3d 1299, 1302–03 (10th Cir. 2007). Since the time of the *Haga* opinion, the Court's holding that an "ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability" has become known as the "pick and choose" rule. *Haga*, 482 F.3d at 1208.

More recent decisions of the Tenth Circuit have clarified the application of *Haga*, but none have overruled it. First, in 2015, the *Vigil* court held it is not always necessary for the ALJ

to make specific limitations in the RFC for concentration, persistence and pace. *Vigil v. Colvin*, 805 F.3d 1199, 1203-04 (10th Cir. 2015). In *Vigil*, the Tenth Circuit found that the ALJ adequately accounted for moderate limitations in concentration, persistence and pace by limiting the plaintiff to unskilled work. *Id.* It noted that unskilled work generally requires only the following: (1) understanding, remembering, and carrying out simple instructions; (2) making judgments that are commensurate with the functions of unskilled work – *i.e.*, simple work-related decisions; (3) responding appropriately to supervision, co-workers and usual work situations; and (4) dealing with changes in a routine work setting. *Id.* (quoting SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996)).

In 2016, the *Smith* court ratified the *Vigil* court's holding that "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016) (citing *Vigil*, 805 F.3d at 1204). On appeal, the *Smith* court reviewed an ALJ's RFC determination based on a non-examining physician's assessment of nine nonexertional limitations that sounded in the categories of (1) sustained concentration and pace, (2) social interaction, and (3) adaptation. *Id.* at 1268. The physician, when reducing these limitations to her RFC narrative, omitted the majority of the nine and recommended instead that the claimant "could (1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ adopted the recommendation, and found that the claimant "(1) could not engage in face-to-face contact with the public and (2) could engage in only simple, repetitive, and routine tasks." *Id.* at 1269. "Through these findings," the Tenth Circuit held, "the [ALJ] incorporated the functional limitations of [the claimant's] moderate nonexertional limitations." *Id.* The *Smith* court reasoned that the "notations of moderate limitations served only to aid [the physician's]

assessment of residual functional capacity." *Id.* at 1269, n2. Correspondingly, the Tenth Circuit explained that the court's function is not to compare the ALJ's findings to a physician's "notations of moderate limitations," but rather, to compare the ALJ's findings to the physician's opinion. *Id.*

In the instant case, the ALJ reviewed five medical opinions, each of which recommended nonexertional limitations. Between the five, the medical professionals recommended moderate – and one occasionally *marked* limitation [AR 1016 (Dr. Krueger)] – across the four categories assessed by the SSA. This falls outside of the guidance of *Vigil*, where the court found "the ALJ accounted for [the claimant's] moderate concentration, persistence, and pace problems in his RFC assessment by limiting him to unskilled work." *Vigil*, 805 F.3d at 1204. In fact, the *Vigil* court warned against the approach adopted by the ALJ here, cautioning that "[t]here may be cases in which an ALJ's limitation to 'unskilled' work does not adequately address a claimant's mental limitations." *Id.* (citing *Chapo*, 682 F.3d at 1290 n. 3 (recognizing that restrictions to unskilled jobs do not in all instances account for the effects of mental impairments)). The ALJ eschewed this guidance and instead tried to address Plaintiff's litany of mental limitations – which were not confined to concentration, persistence, and pace – by limiting her to unskilled work. *Vigil* does not support that proposition.

Similarly, the ALJ's decision does not fall within the four corners of *Smith v. Colvin*. In *Smith*, the ALJ emulated a nonexamining physician's reduction of multiple moderate limitations into two practical RFC restrictions that encompassed the claimant's moderate limitations. *See Smith*, 821 F.3d at 1268. The ALJ in *Smith* effectively carried these recommendations over into her RFC. *Id.* at 1269. Here, the ALJ made no such efforts. Indeed, none of the five narratives propounded my medical professionals in this case is adequately represented in the ALJ's RFC

28

recommendation. Thus, this Court cannot say that the ALJ adequately accounted for the moderate nonexertional limitations identified by medical professionals. Moreover, neither *Vigil* nor *Smith* allows an ALJ to account for a *marked* limitation, like that identified by Dr. Krueger, to be satisfactorily addressed by limiting a claimant to a class of work. Therefore, even if this Court could meaningfully review the opinion crafted by the ALJ, it would nonetheless be forced to find that the ALJ committed reversible error by picking and choosing through uncontradicted medical opinions, taking only the parts that were favorable to a finding of nondisability. *See Haga*, 482 F.3d at 1208. Because the ALJ did so, and made no attempt to explain why, her decision must be reversed and remanded. *See Frantz*, 509 F.3d at 1302–03 (remanding where RFC failed to reflect moderate limitations and failed to explain the omission).

**B. Step Five Claim, Post-Hoc Rationalizations, and Harmless Error**

The Court need not reach the merits of Plaintiff's step five claim. *See* Pl.'s Mot. 12-14. Because the ALJ failed to address or explain her reasoning for discounting Plaintiff's litany of nonexertional limitations, the error of the ALJ's step five analysis is inherent and unmistakeable.

Furthermore, the Court rejects the Commissioner's last two attempts to salvage the ALJ's decision. The Commissioner cites to numerous regulations and citations from the record to try and justify the ALJ's total avoidance of Plaintiff's nonexertional limitations and application of the grids. *See* Def.'s Resp. 6-10. Had the ALJ supported her decision as the Commissioner has tried to do for her in the response brief, this opinion might look very different. However, she did not. This Court may evaluate the ALJ's opinion solely on the reasons stated in the decision. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69 (1962). Or, as stated by the Tenth Circuit, "[a]ffirming this post hoc effort to salvage the ALJ's decision would require us to overstep our institutional role and usurp essential functions committed in the first instance to the

administrative process." *Allen v. Barnhart,* 357 F.3d 1140, 1142 (10th Cir. 2004). This, the Court will not do.

Finally, the Commissioner's harmless error argument is without basis. *See* Def.'s Resp. 10. This Court cannot ascertain, definitively, what weight the ALJ intended to assign to the medical opinions at issue. Each medical professional recommended moderate nonexertional limitations, and one identified a marked limitation. On remand, the ALJ may reject them all for reasons yet unidentified, but that potential does not preclude this Court's current remand. The Commissioner cannot state that Plaintiff's RFC will not change, when the current analysis underlying that RFC is so confusing as to preclude meaningful appellate review. Therefore, the Court rejects the Commissioner's invitation to affirm based on harmless error.

## VI.    CONCLUSION

For the reasons articulated above, the Court cannot find that the ALJ's decision was supported by substantial evidence or that the ALJ correctly applied the proper legal standards.

**IT IS THEREFORE ORDERED** that "Plaintiff's Memorandum in Support of Her Motion to Reverse and [Remand] the Commissioner's Final Decision" [ECF No. 12] is **GRANTED.**

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **REVERSED** and that the instant cause be **REMANDED** for further review consistent with this opinion**.**

**IT IS SO ORDERED.**

_____

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***